UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BRADLEY BARBER, )
)
   Plaintiff, )
)
v. )
) CV 95-BU-1229-S
POLLY CONRADI, et al., )
)
   Defendants. )
)
)

Memorandum Opinion

    On August 6, 1997, the United States Court of Appeals for the Eleventh Circuit issued an unpublished opinion vacating in part an order entered by the Honorable Sharon Lovelace Blackburn of this Court, which had dismissed all of the claims brought by all of the original plaintiffs to this action. The Court of Appeals remanded the case for this Court to consider further whether Plaintiff Bradley Barber, pro se, might maintain a number of his claims, which were brought against the defendants, Polly Conradi, Susan Lee, and Richard Jones, pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986. Following remand, on June 2, 1998, Jones filed a motion for judgment on the pleadings or, in the alternative, for summary judgment on Barber's remaining claims against him (Doc. 28). On September 30, 1998, Conradi and Lee filed a motion for summary judgment on the remaining claims against them (Doc. 36). These dispositive motions are now before the Court. On April 9, 1999, Barber filed evidence and "objections" in opposition to the defendants' motions. In addition, Barber has directed the

Court's attention to his verified complaint[1] and supporting exhibits.[2] Upon due consideration, the Court concludes that Jones's motion for judgment on the pleadings is due to be GRANTED and Conradi and Lee's motion for summary judgment is due to be GRANTED.

## FACTS & BACKGROUND[3]

Barber is a member of the National Congress for Fathers and Children ("NCFC"), an association advocating fathers' rights. Barber and two other members of NCFC, Patricia Duchock and Stephen Duchock, sought to compile and publish information about divorce proceedings involving children from the court files of the Domestic Division of Alabama's Tenth Judicial Circuit Court. More specifically, Barber and the Duchocks desired to determine, for every such divorce case filed in 1992 in Jefferson County, Alabama, the following: which parent had filed for divorce, whether the parties had been represented by counsel, how many children were involved, which parent was awarded custody in disputed cases, which parent had to pay child support and how much, which parent had to pay court costs, and which judge had presided over the case. The object of this investigation was to determine whether and to what extent fathers might have been the victims of discrimination

---

[1] A verified pleading may be treated as an affidavit on summary judgment if it satisfies the standards of Fed. R. Civ. P. 56(e). United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Ala., 941 F.2d 1428, 1444 n.35 (11th Cir. 1991), citing Gordon v. Watson, 622 F.2d 120, 123 (5th Cir.1980).

[2] Barber suggests that the Court has "lost" the supporting exhibits he attached to his filed complaint. See Plaintiff's "Objection to Defendants' Motions for Summary Judgment," at 5 n.4. Barber has also previously accused the Court of having "lost" a videotape he submitted, causing him to submit an additional copy. However, the Court notes that there does appear to be a substantial number of referenced exhibits attached to the complaint in the file, and the file now seems to include two videotapes submitted by Barber. Thus, it appears that the Court has all the evidence submitted by Barber.

[3] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

in such divorce proceedings, and to "monitor" the elected judges ruling in such cases.

On July 22, 1993, Barber and the Duchocks entered the Jefferson County Courthouse and proceeded to the Circuit Clerk's Office to begin compiling data. At first, the three hoped to use public computer terminals containing basic information on each case filed in the court. However, they were soon told that the specific information they sought was not available on the computers. Barber and the Duchocks then went to the Domestic Relations counter and requested to inspect the original paper court files regarding divorce cases involving children. There they were told, however, that they could inspect the divorce files but that there was not any way to determine from the reference markings on the outside of the files whether or not the case involved minor children. Therefore, to compile all the information they sought, it would be necessary for the group members to inspect the file of every one of the approximately 4,200 divorce cases filed in 1992 in Jefferson County, Alabama's most populous. To that end, Barber and the Duchocks requested to see the court files in sequence starting with the first divorce case filed in 1992. At first, an employee in the domestic relations department, Donna Gardner, was bringing them three files at a time, each time she went to the shelves to pull files for other persons. However, Gardner's supervisor told her that she could bring one file at a time and that a request card had to be filled out for each one. For maintaining the integrity of court records, the clerk's office has policies that every individual who utilizes a case file must sign out a card for each individual file and that only officers of the court are permitted to take original files out of the clerk's office, for purposes of court use. On that first day, Barber and his companions examined the files for the first 72 cases filed in 1992, 23 of which involved minor children and were of interest to the group.

On July 27, 1993, Barber and Patricia Duchock went back to the Domestic Relations Department to resume their inspection of the divorce records. After requesting and receiving the files on the next two divorce cases, Barber was approached by Defendant Conradi, who is the Circuit Court Clerk for Jefferson County. She told Barber that his requests to review every

file were disrupting the court's normal business, and she indicated that he and Duchock would be limited to inspecting the divorce files for only two hours per week and only when the clerk's office was not busy. Conradi then told Defendant Lee, who is the Deputy Clerk, that Barber was "to stay only two hours and then tell him he is to leave after that time." Defendant Jones, who is a Jefferson County Deputy Sheriff assigned to courthouse security, heard Conradi's statement from his station at the entrance to the Domestic Relations portion of the courthouse. He assured Conradi that her directive would be carried out, stating, "We will see to it Ms. Polly." About two hours later, Lee told Barber and Patricia Duchock to leave. They acquiesced and left voluntarily.

In early August, Barber and other NCFC members returned on two occasions to inspect more divorce case files. First, on August 2, 1993, Barber and Stephen Duchock were permitted to look at files for two hours until Lee told them that they had received their allotted time for the week and that they would have to leave. They again left voluntarily after having completed an examination of the first 132 divorce filings of 1992, but they advised Lee that they would be back the next day.

True to their word, Barber, Patricia Duchock, Stephen Duchock, and two other NCFC members arrived at the courthouse on August 3, 1993 to "challenge" the two-hours-per-week policy established by Conradi. Before entering the Domestic Relations portion of the courthouse, Barber and his companions, were required to empty their pockets and go through a metal detector, as are all persons entering that area. While they were stopped at the desk, before entering the Domestic Relations area, Jones told Barber, "Before you go back there [to the public records office], I want you to read this . . . I'm just trying to help you." Jones started to hand Barber a blue covered book, but then said, "Uh, never mind." But Barber urged Jones to let him read whatever was in the book, and Jones handed the book to Barber. The book turned out to be a copy of the Alabama Criminal Code, and Jones had marked section 13A-10-2, entitled "Obstruction of government operations," which Barber read aloud. After Barber

and Stephen Duchock "discussed their options," they decided to continue on to the records office to attempt to view additional divorce case files. Jones called for "reinforcements," but Barber and his party were permitted to proceed. Barber and Stephen Duchock entered the records area, where Lee told them, "I cannot help you today because you have already had your two hours this week." Barber responded, "Thank you, however, here is my card [requesting the next divorce case file], and we will wait to be served." Neither Barber nor Stephen Duchock was served, however, and after about 1 ½ hours Barber and the members of his party left the courthouse voluntarily.

On May 16, 1995, Barber, Stephen Duchock and Patricia Duchock filed their complaint in this action, asserting various causes of action, seeking both money damages and injunctive relief against Conradi, Lee, and Jones, in both their individual and official capacities. On March 29, 1996, Judge Blackburn entered an order dismissing all of the claims. The United States Court of Appeals for the Eleventh Circuit subsequently vacated that order in part, remanding the case for further consideration of whether Barber[4] might obtain relief on two of his constitutional claims brought pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1986. Those claims recognized as potentially viable by the Court of Appeals were: (1) that the two-hours-per-week limit upon Barber's viewing of the court records, as established by Conradi and "enforced" by Lee and Jones, was unduly restrictive and violated the First Amendment (the "right-to-access claim") and (2) that the defendants had allegedly treated Barber differently from others seeking access to the files based upon his beliefs and his association with a fathers' rights group, and had thereby violated his rights to free speech and association protected by the First Amendment and his right to equal protection of the laws under the Fourteenth Amendment

---

[4]Stephen and Patricia Duchock were listed in the complaint as plaintiffs, but Barber was the only plaintiff, according to the Court of Appeals' opinion, who properly perfected a timely appeal of Judge Blackburn's order.

(the "disparate treatment claim"). The Court of Appeals acknowledged that, as to both claims, the Eleventh Amendment shielded all the defendants from liability for money damages in their official capacities and that the defendants were entitled to qualified immunity on the reasonable access claim insofar as Barber sought to recover money damages against the defendants in their individual capacities. However, the Court of Appeals concluded that, at that stage of the proceedings, qualified immunity had not been established on the disparate treatment claim, thus allowing that the defendants might be sued for damages in their individual capacities on that claim. The Court of Appeals also held that further consideration was required on whether the disparate treatment claim or the right-to-access claim or both might be the basis for injunctive relief, because qualified immunity precludes only suits for damages, not injunctive relief. The Court of Appeals affirmed the dismissal of all other claims. On remand, in the motions now before this Court, the defendants seek to have the remaining claims against them dismissed.

## CONTENTIONS & ANALYSIS

### A. The Claims Against Jones

In his motion, Jones asserts he is entitled to judgment on the pleadings under Fed. R. Civ. P. 12(c) or, in the alternative, to summary judgment under Fed. R. Civ. P. 56, as to all remaining claims against him, because, he maintains, the specific factual allegations of the complaint and evidence submitted undisputedly show that he did not actually restrict Barber's access to the court documents he sought. The Court agrees that Barber's allegations are insufficient to indicate that Jones committed any constitutional violation, and the Court will grant Jones's motion for judgment on the pleadings.

Under Fed. R. Civ. P. 12(c), "[j]udgment on the pleadings is appropriate when 'no issues of material fact exist, and the movant is entitled to judgment as a matter of law.'" Slagle v. ITT Hartford, 102 F.3d 494, 497 (11th Cir. 1996), quoting Ortega v. Christian, 85 F.3d 1521, 1524 (11th Cir.1996). The complaint may not be dismissed "unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Slagle, at 497, quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957) and also citing Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993). A court reviewing a judgment on the pleadings, must accept the facts in the complaint as true and view them in the light most favorable to the nonmoving party. Slagle, at 497.

In its opinion in this case, the Eleventh Circuit Court of Appeals stated, "Barber and other members of his group were restricted in their access to court records by Defendants-Appellees, Polly Conradi, Circuit Clerk for Jefferson County, Alabama; Susan Lee, Deputy Clerk; and Richard Jones, Jefferson County Deputy Sheriff." Barber v. Conradi, No. 96-6541, at *2-*3 (11th Cir. 1997) (footnote omitted). Thus, the opinion would seem to suggest that the Court of Appeals acknowledged that Barber had alleged in his complaint that all three defendants, including Jones, had acted to restrict Barber's access to the court records. Indeed, Barber does charge in his complaint that Jones acted "under color of office and law [to] cause[] the deprivations of Federally protected rights of the plaintiffs in seeking to enforce the . . . policy for the Circuit Clerk by false arrest and intimidation without lawful authority or cause and deny access to public records." Complaint ¶ 7 (internal quotations omitted).

However, even assuming that restricting Barber's access to the court records he sought would constitute a constitutional violation, in closely examining the specific factual claims of the complaint it is apparent Barber does not allege that Jones ever actually restricted in any way Barber's access to the court records. There is no allegation that Jones had any contact whatsoever with Barber or any of his companions on the first visit to inspect the court files, on July 22, 1993. On Barber's second visit to examine the court records, on July 27, 1993, after Conradi stated to Lee that Barber was to stay only two hours and then was to leave Jones did respond, "We will see to it, Ms. Polly." This does suggest that Jones implied he would enforce the policy and restrict Barber's access if it was required. However, Jones was never actually called upon to do so; Barber alleges that after he was in the records area for two hours, Lee told

him to leave, and Barber acknowledges that he left voluntarily without any further involvement by Jones. Complaint ¶ 48. Similarly, on August 2, 1993, Barber and the other members of his party voluntarily left the records area after being told to leave by Lee, not Jones. Id. at ¶ 49. The only alleged contact with Jones on this date was when Barber told Jones that he and his party would return the next day, Jones supposedly replied, "Humphhhhh!" Id. at n.20. On Barber's final visit, on August 3, 1993, there was more interaction between Barber and Jones, but the allegations still do not show that Jones denied Barber access to documents or enforced a policy doing so. When Barber was standing by the security desk at the entrance to the domestic relations area, Jones did hesitantly hand him the copy of the Alabama Criminal Code, marked at the section on the offense of "Obstructing governmental operations." Nonetheless, Barber was permitted to proceed to the records area, and Barber again left of his own accord after Lee refused to serve him because he had already received his two hours for the week. Complaint ¶¶ 63-70.

Thus, while Barber maintains generally that Jones "enforced" the policy, Barber's specific factual claims demonstrate that Jones did not actually do so. There are no allegations indicating that Jones ever denied Barber access to judicial records, nor is there any viable claim that he arrested Barber in furtherance of the policy or otherwise.[5] Indeed, Barber does not even allege that Jones ordered them to leave the records area or any other place. Again, the Court will assume at this point that the underlying two-hours-per-week policy established by Conradi violates the constitution. But even if it were further assumed that if Jones "enforced" such policy by actually restricting Barber's access to the records he would have violated Barber's

---

[5]Barber had asserted that Jones had committed a false arrest when he pointed out to Barber the criminal code section while they were standing at the security desk outside the domestic relations area. Judge Blackburn held, however, that the allegations concerning this incident showed that no reasonable person would have believed that they were not free to leave. Accordingly, because she ruled as a matter of law that no arrest occurred, Judge Blackburn dismissed the false arrest claim, and said dismissal was affirmed on appeal.

constitutional rights, Barber's allegations indicate, at most, only that Jones may have threatened to enforce the policy restricting his access at some future time if Conradi or Lee requested that he do so. Threatening to deprive someone of a constitutional right is not the same thing as depriving someone of a constitutional right, and such threats do not, standing alone, support a cause of action under 42 U.S.C. § 1983. See Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987); see also Girard v. Raha, 872 F.2d 1025 (8th Cir. 1989); Earle v. Benoit, 850 F.2d 836 (1st Cir. 1988). Thus, Barbers's allegations to not state a claim against Jones for a violation of his First or Fourteenth Amendment Rights.

The Court also notes that, while the Eleventh Circuit Court of Appeals acknowledged that Barber might maintain his claims for injunctive relief, there is no basis for granting equitable relief against Jones in this case. In the first place, Barber's complaint specifically requests injunctive relief only against Conradi and her successors in office, not against Jones. See Complaint ¶ 98. This is understandable since there is no indication that Jones has custody or control over the court records Barber seeks. In addition, to be entitled to permanent injunctive relief from a constitutional violation, a plaintiff must first establish the fact of the violation. Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982) (citing Rizzo v. Goode, 423 U.S. 362, 377 (1976)), cert. denied, 460 U.S. 1083 (1983). As stated above, Barber has not established that Jones acted to deprive him of his constitutional rights, and he is not, therefore, entitled to an injunction against Jones. Accordingly, this Court concludes that Jones's motion for judgment on the pleadings is due to be granted.

B. The Disparate Treatment Claims Against Conradi and Lee

In their motion, Conradi and Lee first assert that they are entitled to summary judgment with regard to Barber's claims for damages and injunctive relief based upon his disparate treatment claim, alleging violations of the First and Fourteenth Amendments. Conradi and Lee admit that they limited Barber's access to the court documents in their charge to two hours per week. However, they deny that they treated Barber differently based upon any group

affiliation, and they claim Barber cannot establish a First or Fourteenth Amendment violation with regard to disparate treatment. The Court agrees that all defendants are entitled to summary judgment with respect to Barber's disparate treatment claim.

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response to a properly supported motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Thus, when the plaintiff in a § 1983 action "fails to make a showing sufficient to establish the existence of an element essential to [plaintiff's] case, and on which [plaintiff] will bear the burden of proof at trial," Celotex, 477 U.S. at 322, a public official defendant is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. Bennett v. Parker, 898 F.2d 1530, 1532 (11th Cir. 1990). However, in determining whether genuine issues of material fact exist, the court is to resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The Court will assume that if Conradi or Lee restricted Barber's access to the court files based upon his affiliation with a fathers' rights group, such would constitute a constitutional violation. Of course, in order to prevail on such a claim, Barber bears the burden of proof to establish, as an element of the claim, that his affiliation with that group was a "substantial" or "motivating" factor in restricting his access to the court records. See Gattis v. Brice, 136 F.3d 724, 726 (11th Cir. 1998).

In support of their motion for summary judgment, Conradi and Lee have submitted Lee's declaration, in which she indicates that the two hour weekly limit placed upon Barber's

access has nothing to do with his association with any group. Rather, Lee alleges, the restriction was based upon the fact that Barber's request to inspect the original paper court file of every single one of thousands of divorce cases was unprecedented and unduly interfered with the ability of the clerk's office to serve the needs of the court and other members of the public. This fulfils the defendants' obligation, as the movants for summary judgment, to show that they did not act out of an unconstitutional bias. Therefore, in order to survive summary judgment, Barber must come forward with sufficient evidence to allow a finding that Conradi or Lee discriminated against Barber because of his affiliation with a fathers' rights group. This Barber has not done.

Barber has made a number of bare statements that the defendants have discriminated against him on the basis that he is a member of the NCFC, the fathers' rights group. However, while such self-serving conclusory allegations may be enough to survive a motion to dismiss, they are insufficient, without more, to withstand a motion for summary judgment. See Holifield v. Reno, 115 F.3d 1555, 1564 n. 6 (11th Cir.1997). There is no direct evidence of statements by any defendant indicating that any of them discriminated against Barber because of his association with the NCFC. Nor is there evidence indicating that any defendant made statements indicating even a bias against the group or the goals it sought to further. Barber does present evidence indicating that he and his companions wore buttons identifying themselves as members of the NCFC and that they explained to the defendants that their interest in the court files was related to their advocacy of fathers' rights. However, that the defendants were aware that Barber was a fathers' rights proponent and placed some restrictions on his access to judicial records does not in itself give rise to an inference that there is a causal connection between the two. Barber has made vague accusations that Conradi and "other court personnel have 'harmed' cases filed by members of [the NCFC] . . . ." Plaintiff's Objection to Motions for Summary Judgment, at 14. However, Barber offers no concrete evidence to substantiate his claims that Conradi or Lee intentionally harmed files concerning NCFC members. Barber also

speculates that the defendants would not have placed the restrictions upon his access to the records if he was exhorting the rights of mothers or women. But this is mere conjecture. It is true that Conradi has not limited the access of other members of the public to the court records in the domestic relations division of the circuit court in the same way that she has limited Barber's access. It is also true that the Equal Protection Clause requires that similarly situated persons be treated similarly. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). However, the defendants have presented evidence, which Barber has failed to counter, indicating that no other group or individual has made a request even remotely similar to Barber's demand to review every single one of several thousand original paper court files. Barber has failed to present evidence indicating that Conradi or Lee discriminated against him because he was a member of a fathers' rights group, and the Court concludes that Conradi and Lee's motion for summary judgment is due to be granted on the disparate treatment claim, as to both claims for damages and injunctive relief.

### C. The Right-To-Access Claim Against Conradi and Lee

Barber's only remaining claim is that Conradi and Lee violated Barber's First Amendment rights by restricting his access to the court records to two hours per week. The Court of Appeals held that the defendants were entitled to qualified immunity from suit for damages with regard to this claim, so the only remaining question is whether the claim may give rise to injunctive relief. In other words, the issue is whether Barber is constitutionally entitled to receive greater access than the two-hours-per-week allotted to him under Conradi's policy. Conradi and Lee assert that restricting Barber's access to court records to two hours per week is reasonable and constitutional, given the resources of the clerk's office and Barber's extraordinary and unique request to inspect every one of thousands of original court files.

In support of their motion, Conradi and Lee have submitted a declaration made by Lee, wherein she details the caseload responsibilities of the clerk's office regarding the domestic relations division of the circuit court and the resources available to fulfill those responsibilities.

Lee states that in 1997, for example, approximately 5,447 cases were filed and processed in the domestic relations division. Of the approximately 13 people Lee supervises, five perform bookkeeping functions, seven post filings to the court files, and only one person is assigned to the records room. This individual is the only one who is available to actually pull from the shelves the actual paper files for the use of the parties to a lawsuit, their attorneys, the judges, their staffs, and the public. In the summer of 1997, Lee had the records room employee track the activity within her responsibilities, in order to give "some indication of [the office's heavy] work flow." Lee Decl. at 2. From August 11-15, 1997, the records room employee pulled 738 files for persons other than judges, she made 3,982 copies of documents, and she waited on 440 individuals. The following week, August 18-22, 1997, the records room employee filed 2,967 papers and pulled 488 files for judges.[6] She also had other regular duties such as answering phones, retrieving inactive cases placed on microfilm, among others. Lee states that Barber is not excluded from routine requests for single or a few files at a time any time the clerk's office is open for business. However, Lee explains, given the office's heavy caseload and limited resources, Barber was told that his voluminous request interfered with the office's ability to fulfill its responsibilities to serve the court and other members of the public. Therefore, Lee offers, Barber was told that his request could best be served by coming for two hours per week in the afternoons, preferably on Fridays when other requests for files were usually slow.

    The United States Supreme Court has expressly recognized a common-law right of access to court records in criminal cases. See Nixon v. Warner Communications, 435 U.S. 589 (1978). The Eleventh Circuit Court of Appeals has also stated that there is a common-law right of access to civil proceedings. See Wilson v. American Motors Corp., 759 F.2d 1568, 1570

---

[6] Lee also submits that the statistics from the two-week period in August likely reflected a lower than normal work flow in the division, because many persons, including lawyers and judges, allegedly attend conferences and vacation during that time of the summer.

(11th Cir. 1985). Neither that Court nor the Supreme Court, however, appears to have yet ruled on whether there is a constitutional right of access to court documents and, if so, the scope of such a right. However, the Supreme Court has held that the First Amendment guarantees the public and the press a right of access to attend criminal trials and at least some pretrial proceedings, see Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 558-81 (1980) (plurality opinion); Press Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) ("Press Enterprise II"); Press Enterprise Co. v. Superior Court, 464 U.S. 501 (1984) ("Press Enterprise I"). Such public scrutiny over the court system serves to (1) promote community respect for the rule of law, (2) provide a check on the activities of judges and litigants, and (3) foster more accurate fact finding. Grove Fresh Distributors, Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir. 1994) (citing Richmond Newspapers, supra). The Courts of Appeal have agreed that the reasoning behind this constitutionally protected presumed access to criminal proceedings applies equally to civil proceedings. See, e.g., Rushford v. New Yorker Magazine, Inc., 846 F.2d 249 (4th Cir. 1988); Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165 (6th Cir. 1983); In re: Continental Illinois Securities Litigation, 732 F.2d 1302 (7th Cir. 1984); F.T.C. v. Standard Financial Management Corp., 830 F.2d 404 (1st Cir. 1987). Thus, it is generally accepted that the First Amendment guarantees the press and the public access to aspects of court proceedings, including documents, "if such access has historically been available, and serves an important function of monitoring prosecutorial or judicial misconduct." Washington Post v. Robinson, 935 F.2d 282, 287 (D.C. Cir. 1991), citing Press Enterprise II, 478 U.S. at 8.

Generally, a first amendment right of access can be denied only by proof of a "compelling governmental interest" and proof that the denial is "narrowly tailored to serve that interest." Baltimore Sun Co. v. Goetz, 886 F.2d 60, 64 (4th Cir. 1989), quoting Globe Newspaper, 457 U.S. at 606. However, limitations on the right of access that resemble "time, place, and manner" restrictions on protected speech, are not subjected to such strict scrutiny.

See Globe Newspaper Co. v. Superior Court for Norfolk County, 457 U.S. at 606-07 n.17; Richmond Newspapers, 448 U.S., at 581 n. 18; (plurality opinion); id., at 598, n. 23 (Brennan, J., concurring in judgment); id., at 600, (Stewart, J., concurring in judgment). For example, although the Constitution guarantees the right of the public to attend criminal trials, a trial judge may, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial, just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic. Richmond Newspapers, 448 U.S. at 581 n.18 (plurality opinion). The validity of a time, place, and manner restriction still must be narrowly tailored to serve a substantial government interest, but it need not be the least restrictive or least intrusive means of doing so. Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). Rather, the requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Id., citing United States v. Albertini, 472 U.S. 675, 689 (1985). The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted. Id. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less . . . restrictive alternative." Ward, 491 at 800; see also United States v. Hastings, 695 F.2d 1278 (11th Cir.) (holding that a "time, place, and manner" restriction of right of access of the press to observe criminal trials is constitutional if it is reasonable, if it promotes significant governmental interests, and if it does not unwarrantedly abridge opportunities for communication of thought), cert. denied, 461 U.S. 931 (1983).

    In this case, there has not been a complete or total denial of access to the court records sought by Barber. Indeed, there is no dispute that the court files in question are public records

and that Conradi and Lee will allow Barber eventually to inspect every file if he so desires. Rather, what Conradi and Lee have done is to impose and enforce restrictions upon the time, place, and manner by which Barber might obtain such access to the court files. Thus, to survive an attack under the First Amendment, the two-hours-per-week limitation on Barber's ability to inspect sequentially every one of approximately 4,200 original paper files in the records area of the domestic relations division must simply pass muster under the standards on content-neutral time, place, and manner restrictions, as enunciated in Ward, supra. First, the two-hour limit must further a substantial government interest. The Court has no trouble holding that the efficient administration of the domestic relations division of the circuit clerk's office is a substantial government interest.

Thus, the only remaining question is whether the means chosen were not substantially broader than necessary to achieve the interest to be furthered. In this case, because Barber could not extract the information he sought by using the computer terminals made available for public use, he wished to inspect the original paper files of all divorce cases involving minor children that were filed in 1992. Such required the assistance of employees working in the domestic relations department, in pulling and re-shelving each court file. Moreover, the reference markings do not indicate whether a particular case involved minor children, so it would have been necessary to pull and replace every one of approximately 4,200 divorce cases filed during the year in question. The evidence is undisputed that there is only one employee assigned to the records area, who would in effect be relegated to serving Barber's needs, at the expense of the court and other members of the public. Thus, the only reasonable conclusions to be drawn are that, while conducting his research, Barber would be almost continuously requesting that files be pulled and re-shelved, and that this labor-intensive effort was and would be for some time a substantial drain on the limited resources of the domestic relations division. Alabama's Tenth Judicial Circuit serves the most populous county in the state, and the undisputed evidence indicates that each week the domestic relations division of the clerk's

office serves hundreds of persons and pulls and processes thousands of files. Barber's investigation into the court records is important to him. But his quest for information cannot unduly interfere with the clerk's office's ability to perform its functions. Given the sheer volume of his unique demand and the limited resources of the clerk's office, Conradi established limits that would allow Barber to inspect the records he sought, but would also make sure that such inspection would not unduly interfere with the regular duties of the clerk's office. It may be that the efficient administration of the clerk's office could be served by means that are less restrictive upon Barber's right to access. But Conradi was not obliged to adopt the least restrictive means. The Court concludes that the two hours-per-week limit imposed upon Barber's access was not and is not substantially broader than necessary to further the government interest at stake. Cf. Lindquist v. Idaho State Bd. of Corrections, 776 F.2d 851, 858 (9th Cir.1985) (holding that although prison inmates have a First Amendment right to access to the courts, prison officials may regulate law library access, including reasonable time, place and manner of access, taking into account the administrative needs of the institution). The Court may not second-guess the balance struck by Conradi in establishing the limits upon Barber's access, so long as those limits are not substantially broader than necessary. Accordingly, the Court concludes that Conradi and Lee are entitled to summary judgment on Barber's right-to-access First Amendment claim.

## CONCLUSION

The Court concludes that Defendant Richard Jones's motion for judgment on the pleadings (Doc. 28) is due to be granted, as to all claims for both damages and injunctive relief, because the pleadings affirmatively show that Plaintiff Bradley Barber has not alleged that Jones took any actions restricting his access to court documents. Similarly, the Court determines that the motion for summary judgment filed by Defendants Polly Conradi and Susan Lee (Doc. 36) is due to be granted on all remaining claims. There is no evidence indicating that any defendant established or enforced limits upon Barber's access to court documents on the basis that he was

a member of a fathers' rights group, and the evidence shows that the two hours-per-week limit upon Barber's access was not substantially broader than necessary to advance a legitimate governmental interest in the efficient administration of the clerk's office. As to the issues addressed in the grant of summary judgment in favor of Defendants Conradi and Lee, the Court finds that there exists no genuine issue of triable fact.

DONE and ORDERED this 26th day of May 1999.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE